*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0405p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
*Plaintiff-Appellant,*

*v.*

No. 03-6437

JEFFERSON COUNTY SHERIFF'S DEPARTMENT,
KENTUCKY RETIREMENT SYSTEMS, and the
COMMONWEALTH OF KENTUCKY,
*Defendants-Appellees.*

>

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 99-00500—Jennifer B. Coffman, District Judge.

Argued: June 7, 2006

Decided and Filed: October 31, 2006

Before: BOGGS, Chief Judge; MARTIN, BATCHELDER, DAUGHTREY, MOORE, COLE,
CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, and GRIFFIN,
Circuit Judges.

---

## COUNSEL

**ARGUED:** Dori K. Bernstein, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Washington, D.C., for Appellant. Robert D. Klausner, KLAUSNER & KAUFMAN, Plantation,
Florida, for Appellees. **ON BRIEF:** Dori K. Bernstein, EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Washington, D.C., for Appellant. Robert D. Klausner, KLAUSNER &
KAUFMAN, Plantation, Florida, Mitchell L. Perry, JEFFERSON COUNTY ATTORNEY'S
OFFICE, Louisville, Kentucky, Lisbeth A. Tully, C. Joseph Beavin, James D. Allen, STOLL
KEENON OGDEN, Lexington, Kentucky, D. Brent Irvin, OFFICE OF THE ATTORNEY
GENERAL, Frankfort, Kentucky, for Appellees.

MOORE, J., delivered the opinion of the court, in which MARTIN, DAUGHTREY, COLE,
CLAY, GIBBONS, SUTTON, COOK, and GRIFFIN, JJ., joined. ROGERS, J. (p. 12), delivered
a separate opinion concurring in the result. BOGGS, C. J. (pp. 13-18), delivered a separate
dissenting opinion, in which BATCHELDER, GILMAN, and McKEAGUE, JJ., joined.

1

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  Plaintiff-Appellant the Equal Employment Opportunity Commission ("EEOC") brings this public-enforcement age-discrimination lawsuit against Defendants-Appellees the Jefferson County Sheriff's Department, the Kentucky Retirement Systems, and the Commonwealth of Kentucky (referred to collectively as "KRS"), alleging that KRS's disability-retirement-benefits plan for state and county employees violates the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq*., as amended by the Older Workers Benefit Protection Act ("OWBPA"), Pub. Law 101-433, 104 Stat. 978 (1990).  The KRS disability-retirement-benefits plan (hereinafter "The KRS plan") disqualifies employees who are still working from receiving disability-retirement benefits if they have already reached normal retirement-benefit age at the time they become disabled.  The KRS plan also calculates disability-retirement benefits in such a way that an older employee who is eligible to receive disability benefits receives fewer benefits — in the form of lower monthly benefit payments — than a younger disabled employee receiving disability-retirement benefits who is similar to the older disabled employee in every relevant factor other than age.

Both the district court and the original panel of this court concluded that pursuant to *Lyon v. Ohio Education Association and Professional Staff Union*, 53 F.3d 135 (6th Cir. 1995), the EEOC had failed to establish a prima facie violation of the ADEA.  *Lyon* concluded that a retirement plan that used age as a factor to determine benefits in a materially indistinguishable manner to the way that age is used in the KRS plan did not establish a prima facie violation of the ADEA despite the fact that older workers received lower benefits because of their age.  *Lyon* held that in addition to demonstrating disparate treatment on the basis of age, a plaintiff needed to produce evidence of discriminatory animus against older people in order to survive the employer's summary-judgment motion.

After reviewing the parties' arguments and the relevant law, we conclude that the EEOC has established a prima facie violation of the ADEA, because the KRS plan is facially discriminatory on the basis of age.  Supreme Court authority on disparate-treatment-discrimination claims as well as the persuasive authority of many of the other circuits and the history of the ADEA (as amended by the OWBPA) demonstrate that KRS is not entitled to summary judgment.  We further hold that when an employment policy or benefit plan such as the KRS plan is facially discriminatory, a plaintiff challenging that policy does not need additional proof of discriminatory animus in order to establish a prima facie disparate-treatment claim.  Upon en banc review, we conclude that *Lyon*'s standard for a disparate-treatment age-discrimination claim is inconsistent with Supreme Court authority as well as the rulings of several of our sister circuits in cases involving the similar role of age in employee-benefit plans.  We therefore overrule in part our previous decision in *Lyon*.

Because we conclude that the EEOC has established a prima facie claim of age discrimination, we **REVERSE** the district court's grant of summary judgment to KRS on the EEOC's age-discrimination claim and **REMAND** the case to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

The dispute that led to this lawsuit began when Charles Lickteig, who was at the time a Deputy Sheriff with the Jefferson County Sheriff's Department, was denied disability-retirement benefits under the KRS plan because of his age.  Because Lickteig's job as a Deputy Sheriff was

considered hazardous, Lickteig became eligible for normal retirement benefits at age 55,[1] but he chose to continue working past that date because he had school-age children to support. Joint Appendix ("J.A.") at 49 (Lickteig Aff. ¶ 11). In 1995, Lickteig, who had worked as a Deputy Sheriff since 1978, became disabled due to "a deteriorating vertebra[], arthritis, nerve damage, and Parkinson's disease" to the point that he could no longer perform his Deputy Sheriff duties. J.A. at 48 (Lickteig Aff. ¶¶ 4, 6). In July 1995, at age sixty-one and with seventeen years and seven months worth of service, Lickteig applied for disability-retirement benefits under the KRS plan. J.A. at 42 (William Hanes Aff. ¶ 3); J.A. at 49 (Lickteig Aff. ¶ 7). In a letter dated August 25, 1995, defendants notified Lickteig that his request for disability-retirement benefits had been denied because of his age. In its denial letter, KRS explained:

> Our laws state that you must have at least 60 months of service credit, be under age 55, and apply within 12 months of your last day of paid employment in a regular full-time position to qualify for Disability Retirement. Therefore, you are not eligible to apply for Disability Retirement since you are over age 55 and in a hazardous position.

J.A. at 51 (Lickteig Denial Letter). As a result of the denial of his request for disability-retirement benefits, Lickteig filed a charge of discrimination with the EEOC in February 1996, alleging that defendants illegally denied him the benefits because of his age. J.A. at 57-59 (EEOC Charges). The EEOC began investigating Lickteig's charges and eventually concluded that the KRS plan violated the ADEA.

The material aspects of the KRS plan are as follows. First, the KRS plan provides two types of retirement benefits — normal retirement benefits and disability-retirement benefits. Employees like Lickteig who work in hazardous positions are eligible for normal retirement benefits at age fifty-five or after completing twenty years of service, whereas an employee working in a nonhazardous position is eligible for normal retirement benefits at age sixty-five. The EEOC is not challenging the KRS plan provisions for normal retirement benefits for either class of employees, but rather only the plan's provision of disability-retirement benefits. As Lickteig is a hazardous-category employee, the district court and the original hearing panel of our court analyzed only the disability-retirement plan's impact upon employees in hazardous positions, and we do the same. We note, however, that our holding is equally applicable to KRS's treatment of employees in nonhazardous positions to the extent that the disability-retirement plan utilizes age in a materially indistinguishable way in the provision of disability-retirement benefits to employees in nonhazardous positions.

The EEOC argues that the KRS plan's provisions of disability-retirement benefits violates the ADEA because the plan "denies benefits or pays reduced benefits, because of age." J.A. at 21 (Compl. at 1). As the original hearing panel of our court explained:

> The [KRS disability-retirement benefits] scheme appears to disadvantage older workers by virtue of the fact that a class of workers, determined in significant part by age (actually youth), gets unworked years attributed to them for purposes of calculating the amount of disability retirement. When workers are disabled after they become eligible for normal retirement, they receive only normal retirement benefits. The amount of the yearly benefits is generally calculated as 2.5% of the employee's final compensation times the number of years worked. However, for employees who

---

[1] As the original panel of this court explained, under the KRS retirement system, "[a]n employee in a hazardous position is eligible to receive normal retirement benefits at age 55, or with twenty years of service, Ky. Rev. Stat. §§ 16.576, 16.577(2), 61.592(4), 78.545(31), whereas an employee in a nonhazardous position is eligible to receive normal retirement benefits at age 65. Ky. Rev. Stat. § 61.510(18)." *EEOC v. Jefferson County Sheriff's Dep't,* 424 F.3d 467, 469 (6th Cir. 2005), *vacated on grant of reh'g en banc* (2006).

are not yet eligible for normal retirement (i.e., employees under age 55 and with fewer than 20 years of service), additional years are added to the number of years worked for purposes of the calculation [of disability-retirement benefits].  The number of years added is the number of years remaining until the worker *would have* reached either normal retirement age or twenty years of service, but no more than the number of years already worked.  The purpose appears to be to give a disabled worker the amount of benefit he would have been entitled to had he worked until normal retirement, notwithstanding the fact that he had not actually worked those additional years.

Under this scheme, disability retirement benefits will often be greater than normal retirement benefits for employees with the same years of service (but less than twenty years of service) and the same final compensation.  The employee who receives normal retirement benefits will be entitled to 2.5% of his final compensation times his actual service years, whereas the employee who will receive disability retirement benefits will receive the same 2.5% of his final compensation, but will have it multiplied by a number that is higher than his actual years of service, leading to a higher benefit.  Moreover, disability benefits will be greater for workers who become entitled to disability retirement at a younger age with the same number of years of service.

*EEOC v. Jefferson County Sheriff's Dep't*, 424 F.3d 467, 469-70 (6th Cir. 2005) (footnotes omitted), *vacated on grant of reh'g en banc* (2006).

In addition, a hazardous-category employee eligible for the disability-retirement-benefit plan who is injured in the line of duty is guaranteed monthly benefits of at least 25% of monthly final rate of pay, and if the employee has dependent children, she receives a dependent-child benefit of 10% of monthly final rate of pay for each child, up to a maximum for all dependent children of 40% of monthly final rate of pay.  KY. REV. STAT. ANN. § 16.582(6).  The parties do not dispute that an otherwise-identical employee who becomes disabled in the line of duty but because of her age at the time of disability is ineligible for disability-retirement benefits could not receive these additional dependent benefits.

The EEOC has provided charts demonstrating the impact of an employee's age on her disability-retirement-benefit amount in its brief.  EEOC Br. at 14, 16.  These charts illustrate, and defendants do not dispute, that:

assuming every factor, other than age, that is relevant to determine an employee's benefits (*i.e.*, type of position, disabling condition, final compensation, and length of service) is identical, the amount paid annually to a worker who retires on disability at a younger age will frequently exceed (and will never be less than) the annual benefits of a worker who retires due to disability at an older age.

EEOC Br. at 16-17.  Additionally, the EEOC argues, and defendants do not dispute, that:

In every case, a worker younger than normal retirement age (55/65) who retires on disability will receive more benefits each year than an older employee who retires from the same job, with the same disabling condition, length of service, and final compensation, who becomes disabled after reaching 55/65 and must take normal retirement.

EEOC Br. at 16.

The EEOC challenges both the 1998 and the 2000 versions of the Kentucky statute governing the KRS plan.[2]  *See* EEOC Br. at 7-8 (explaining challenged aspects of both the pre-2000 and 2000 versions of the KRS plan); *id*. at A-2 (excerpting portions of the pre-2000 and 2000 versions of the statute).  The original panel explained the key differences between the 1998 and 2000 versions of the statute:

> Prior to July 2000, an employee was not eligible to receive disability retirement benefits unless he was "less than normal retirement age."  Ky.Rev.Stat. § 16.582(2)(b) (1999), Ky.Rev.Stat. § 61.600(1)(b) (1999).  After this litigation began, the provisions were amended, and currently provide that an employee is not eligible for retirement disability benefits if the employee is "eligible for an unreduced retirement allowance." Ky.Rev.Stat. § 16.582(2)(b) (2001) (effective July 14, 2000); *see* 2000 Ky. Acts 385, at *4. Under both versions, an employee who is 55 or older cannot receive disability retirement benefits.  In addition, under the current version, an employee who became eligible to receive normal retirement benefits by virtue of having 20 years of service also could not receive disability retirement benefits.

*EEOC v. Jefferson County*, 424 F.3d at 469 n.1.  The EEOC explains that it is not challenging the exclusion of this latter group of employees — those rendered ineligible for disability-retirement benefits because of their years of service, rather than their age.  The EEOC only "seeks relief for individuals who, because of age, were excluded from disability retirement, or applied for disability retirement and have received fewer annual benefits, since October 16, 1992," which is the enactment date of the OWBPA.  EEOC Reply Br. at 27; *see also* EEOC Br. at 34.

In the fall of 1998, the EEOC and KRS attempted to conciliate this dispute, but the parties could not reach an agreement.  J.A. at 60-62 (Marcia Hall-Craig Aff.).  On August 2, 1999, the EEOC filed this lawsuit in the United States District Court for the Western District of Kentucky, alleging that the KRS plan illegally discriminates on the basis of age in violation of the ADEA. J.A. at 21-23 (Compl. ¶¶ 1-12).  KRS filed a motion to dismiss the suit on Tenth and Eleventh Amendment immunity grounds.  After the district court denied defendants' motion to dismiss, a panel of our court affirmed that decision, holding that, with one exception, the Tenth and Eleventh Amendments do not shield KRS from the EEOC's age-discrimination suit. *EEOC v. Ky. Ret. Sys.*, 16 F. App'x 443, 453 (6th Cir. 2001).  After the case was remanded to the district court, both the EEOC and KRS moved for summary judgment.  The district court granted summary judgment for defendants, concluding that pursuant to our reasoning in *Lyon*, discriminatory intent was necessary to establish a prima facie case of age discrimination in a disparate-treatment claim.  J.A. at 32-33 (Dist. Ct. Op. at 4-5).  The district court recognized that intent could be inferred from a facially discriminatory policy, but found that the KRS plan was not facially discriminatory, and thus concluded that the EEOC had not alleged a valid disparate-treatment ADEA claim.  The EEOC filed a timely notice of appeal.

Although suggesting concerns regarding the soundness of *Lyon*'s reasoning, the original hearing panel of our court deemed itself bound by the *Lyon* decision and affirmed, holding that "[b]ecause the retirement plan at issue in this case is materially indistinguishable from the early

---

[2] We will therefore confine our analysis to the 1998 and 2000 versions of the statute.  We note, however, that the Kentucky Legislature again revised the KRS plan in 2004.  The 2004 revision retained the age-based eligibility requirements of the 2000 version, but altered the calculation of disability-retirement benefits.  For members beginning to participate on or after August 1, 2004, disability-retirement pay is calculated to be "the higher of twenty-five percent (25%) of the member's monthly final rate of pay or the retirement allowance determined in the same manner as for retirement at his normal retirement date with years of service and final compensation being determined as of the date of his disability."  KY. REV. STAT. ANN. § 16.582(5)(b).

retirement incentive plan [held to be consistent with the ADEA] in *Lyon*, the Kentucky Retirement plan cannot be held to violate the ADEA." *EEOC v. Jefferson County*, 424 F.3d at 473. The EEOC petitioned for rehearing en banc, arguing that the KRS plan is facially discriminatory, and that the Commission has therefore established a prima facie claim of age discrimination. The EEOC also urges us to overrule *Lyon* to the extent that *Lyon* holds that a plaintiff challenging a facially discriminatory employment policy must have proof that the policy was motivated by discriminatory animus against older workers in order to state a prima facie violation of the ADEA.

## II. ANALYSIS

We begin with a discussion of the origins of the ADEA, as the history of the Act informs our analysis of the issues raised in this case. Congress considered including age as a protected class when it was debating and drafting Title VII of the Civil Rights Act of 1964, but declined to do so because of concerns that employers might sometimes have a legitimate basis for making age-related employment decisions. *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 587-88 (2004). In order to determine whether Congressional action to address age discrimination was necessary and to understand better what type of legislation might remedy the existing problems, Congress requested that then-Secretary of Labor Willard Wirtz conduct "a full and complete study of the factors which might tend to result in discrimination in employment because of age and of the consequences of such discrimination on the economy and individuals affected." *Smith v. City of Jackson*, 544 U.S. 228, 232 (2005) (quoting Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, § 715, 78 Stat. 265 (1964)).

The Secretary of Labor's report, submitted to Congress in June 1965, concluded that age discrimination was sufficiently widespread that it warranted public concern, but that the nature of age discrimination was quite different from discrimination based upon the classes protected by Title VII. U.S. SECRETARY OF LABOR, THE OLDER AMERICAN WORKER: AGE DISCRIMINATION IN EMPLOYMENT 5-6 (June 1965), *reprinted in* U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, LEGISLATIVE HISTORY OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT 22-23 (1981) (hereinafter "Wirtz Report"). "Because the ADEA was modeled on the Wirtz Report's findings and recommendations, the Report provides critical insights into the statute's meaning." *Smith*, 544 U.S. at 254 (O'Connor, J., concurring in the judgment). The Wirtz Report concluded "that there was little discrimination arising from dislike or intolerance of older people, but that 'arbitrary' discrimination did result from certain age limits." *Id*. at 232 (majority opinion). The Report stated that it had "found no evidence of prejudice based on dislike or intolerance of the older worker," and that "intolerance, of such overriding importance in the case of attitudes toward other groups, assumes minimal importance in the case of older people and older workers." Wirtz Report at 6. Despite finding a lack of discriminatory animus against older people, Secretary Wirtz found "substantial evidence of arbitrary" age discrimination. *Id*. at 5. Secretary Wirtz defined arbitrary[3] age discrimination as "assumptions about the effect of age on [an employee's] ability to do a job *when there is in fact no basis for these assumptions*." *Id*. at 2. The Report explains that a common form of arbitrary age discrimination at that time was the refusal of employers to hire individuals for positions once they had reached a certain age, without any actual relevance to the particular position's job requirements. *Id*. at 6-8.

---

[3] The Supreme Court has largely adopted the Wirtz Report's definition of "arbitrary" age discrimination in its ADEA jurisprudence. In *General Dynamics Land Systems, Inc. v. Cline*, the Court stated that the ADEA's terms "arbitrary limits" and "arbitrary age discrimination" "are unmistakable references to the Wirtz Report's finding" that age ceilings in hiring were at the time widespread. 540 U.S. at 590. "The ADEA's ban on 'arbitrary limits' thus applies to age caps that exclude older applicants, necessarily to the advantage of younger ones." *Id*. Similarly, in her concurrence in *Smith v. City of Jackson*, Justice O'Connor read the Wirtz Report's definition of "arbitrary" as "clearly equat[ing] with disparate treatment" and as treatment on the basis of age that is "intentional and unfounded." *Smith*, 544 U.S. at 255 (O'Connor, J., concurring in the judgment).

The Wirtz Report inspired Congress to request that the Secretary draft proposed legislation to combat age discrimination, and after that was completed, Congress "acted favorably on his proposal" and enacted the ADEA. *Smith*, 544 U.S. at 232-33. In 1967, Congress enacted the ADEA, which now renders it "unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;" as well as "(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(1)-(2).

In this case, the EEOC urges us to conclude that it has established a prima facie claim of age discrimination because the KRS plan facially discriminates against older employees in two ways: (1) the KRS plan renders employees ineligible for disability-retirement benefits simply because of their age, which means that disabled workers who are ineligible for disability benefits because of their age receive lower (normal) retirement benefits than otherwise-similar younger workers who become disabled and are able to receive the greater disability-retirement benefits, and (2) the KRS plan uses an employee's age in order to calculate disability-retirement benefits in such a way that an older eligible employee receives lower monthly disability-benefit payments than an otherwise-similar younger disabled worker.

Defendants argue that, contrary to the EEOC's assertion, the KRS plan does not violate the ADEA because the policy does not discriminate "because of age." KRS Br. at 10. Rather, defendants argue, the KRS plan merely uses age as one of several factors to determine benefits, in the same way that age is a factor in many, if not most, retirement-benefit plans. *See* KRS Br. at 13. Defendants also assert that a valid disparate-treatment claim requires a plaintiff to establish proof of discriminatory motive, and that "[t]here is no evidence that the [KRS plan] framework established to provide benefits to disabled members of Kentucky Retirement was in any fashion age-driven." KRS Br. at 26-27.

We consider first the EEOC's argument that it has established a prima facie ADEA claim because the KRS disability-retirement-benefits plan is facially discriminatory. We then assess KRS's argument that even if the KRS plan is facially discriminatory, the EEOC must produce evidence that the plan was motivated by discriminatory animus against older people in order to sustain its prima facie burden.

**A.    The EEOC Has Established a Prima Facie ADEA Claim Because the KRS Plan Facially Discriminates on the Basis of Age**

The Supreme Court has made clear that an employer's reliance "upon a formal, facially discriminatory policy requiring adverse treatment of employees with that [protected] trait" establishes a prima facie disparate-treatment claim under the ADEA. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)). In *Thurston*, the plaintiffs were pilots who became disqualified to continue serving in the position of captain when they reached age sixty. Unlike individuals who became disqualified from serving as captain for reasons other than age, the plaintiffs were not granted the privilege of automatically transferring to the position of flight engineer. Instead, former captains who became disqualified from continuing in the position of captain because of their age could obtain only a flight engineer position if they were successful in a bidding process.

A unanimous Court stated that even though the airline was not required to provide transfer privileges to any disqualified captains, "if TWA does grant some disqualified captains the 'privilege' of 'bumping' less senior flight engineers, it may not deny this opportunity to others because of their age." *Thurston*, 469 U.S. at 120-21. *Thurston* held that the plaintiffs had established a prima facie

case of age discrimination because "there is direct evidence that the method of transfer available to a disqualified captain depends upon [the captain's] age. Since it allows captains who become disqualified for any reason other than age to 'bump' less senior flight engineers, TWA's transfer policy is discriminatory on its face." *Id.* at 121. *See also City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 715-16 (1978) (finding facial sex discrimination in violation of Title VII where female employees are required to make larger pension contributions than their male counterparts).[4]

When we apply the definition of facial discrimination established by the Court in *Hazen Paper*, *Thurston*, and *Manhart* to the present dispute, it is apparent that the KRS plan is facially discriminatory on the basis of age in at least two ways. First, like the transfer plan in *Thurston*, the KRS plan categorically excludes still-working employees over age fifty-five from a particular employment benefit *because of* their age. In order to be eligible for disability-retirement benefits, employees in hazardous positions must become disabled before they reach age fifty-five. There is absolutely no dispute that under the KRS plan, when such an employee becomes disabled at age fifty-five or older, that older employee is adversely treated because of his or her age when compared to a disabled coworker who is similarly situated in all relevant aspects other than age. On its face, this age-eligibility aspect of the KRS plan mandates disparate treatment of disabled employees on the basis of age. Defendants' decision to render employees in hazardous positions ineligible for disability-retirement benefits simply because they have reached normal retirement age is "a formal, facially discriminatory policy" that discriminates on the basis of age, which is sufficient to establish a prima facie ADEA violation. *Hazen Paper*, 507 U.S. at 610.

The KRS plan is facially discriminatory in a second way, in that KRS employees who become disabled when they are still "young enough" to be eligible for disability-retirement benefits receive reduced benefits compared to otherwise-similar but even younger disabled employees for no reason other than their age. KRS does not dispute that its plan pays lower disability-retirement benefits to an older worker who, apart from age, is similarly situated to a younger worker in all relevant respects. An employee's age, therefore, "actually play[s] a role in" and has "a determinative influence on the outcome" of the amount a disabled employee's disability-retirement-benefit payment is each month. *Hazen Paper*, 507 U.S. at 610. This is a second way that the KRS plan, on its face, requires disparate treatment on the basis of age. *See id.* at 609 (stating that disparate treatment occurs when "[t]he employer simply treats some people less favorably than others because of their" protected trait) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36 n.15 (1977)).

The district court's conclusion, compelled by *Lyon*,[5] that the KRS plan does not facially discriminate on the basis of age is also contrary to the Supreme Court's analysis in *Public Employees Retirement System of Ohio v. Betts*, 492 U.S. 158 (1989). The KRS plan's disqualification of employees age fifty-five and over for disability benefits closely resembles the characteristic of the plan in *Betts* that the Supreme Court found to be facially discriminatory. *See*

---

[4] Interestingly, the Supreme Court in *Manhart* rejected the defendant's argument that plaintiffs must produce actuarial evidence that the facially discriminatory policy actually had a discriminatory effect on women as a class, and held that the absence of this effect-evidence did not defeat plaintiffs' successful disparate-treatment claim based upon the facially discriminatory nature of the policy. *Manhart*, 435 U.S. at 716.

[5] Although *Lyon* involved a challenge to the use of age in the determination of the amount of early retirement benefits, we agree with the original hearing panel in this case that the role that age played in the plan at issue in *Lyon* "is not materially distinguishable" from the role that age plays in the KRS plan. *EEOC v. Jefferson County*, 424 F.3d at 471. Both plans compute the disputed benefits in such a way that the employee's age is the determinative factor in the calculation of the benefit amount, with an older employee receiving lower benefits than an otherwise-similar younger employee. *Id.*

*id.* at 166 (finding that "[o]n its face, the [employee benefit] scheme renders covered employees ineligible for disability retirement once they have attained age 60," but holding that the employer met an exemption under the ADEA because plaintiffs did not provide evidence of "subterfuge"). In response to *Betts*, Congress promptly amended the ADEA to remove the need for proof of subterfuge and to clarify its intent "to prohibit discrimination against older workers in all employee benefits except when age-based reductions in employee benefit plans are justified by significant cost considerations." Older Workers Benefit Protection Act ("OWBPA"), Pub. Law 101-433, § 101, 104 Stat. 978 (1990) (codified at 29 U.S.C. § 621).

The original panel in this case considered *Betts* and the legislative history of the OWBPA. *EEOC v. Jefferson County*, 424 F.3d at 474-75. Nevertheless, the original panel ultimately determined that it was unable to distinguish *Lyon* on that ground because the same legislative material was available to the *Lyon* panel. *Id.* (citing, *inter alia*, excerpts of the final debate about the OWBPA stating that "[t]he bill provides that workers who are on disability cannot be forced to receive only their pension at retirement age" and that under the OWBPA, "they will receive the difference between what is typically a lower pension benefit and the higher disability benefit"). We believe that this legislative history is compelling evidence that when revising the ADEA in response to *Betts*, Congress intended to prohibit the very sort of age-based discrimination that the original panel, bound by *Lyon*, condoned in this plan.

That many of our sister circuits have reached conclusions contrary to *Lyon* lends further support for our conclusion that *Lyon*'s definition of a prima facie ADEA claim can no longer stand. Since *Lyon* was decided, the Second, Seventh, Eighth, and Ninth Circuits have each recognized a prima facie ADEA violation in analogous situations. *See Jankovitz v. Des Moines Indep. Cmty. Sch. Dist.*, 421 F.3d 649, 653 (8th Cir. 2005) (stating that a retirement plan is "discriminatory on its face" because "it is undisputed that an employee is ineligible for early retirement benefits [under the plan] if he or she is over the age of 65"); *Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist.*, 374 F.3d 66, 73 (2d Cir. 2004) (finding prima facie case of age discrimination under ADEA when age "is the effective trigger for eligibility" for retirement policy); *Arnett v. Cal. Pub. Employees Ret. Sys.*, 179 F.3d 690, 695 (9th Cir. 1999) (recognizing prima facie disparate-treatment claim when it "is unquestionable that the [e]mployees would have received greater disability retirement benefits but for their older ages at hire"), *cert. granted*, 528 U.S. 1111, *vacated on other grounds by Kimel v. Florida Bd. of Regents*, 528 U.S. 62 (2000); *Huff v. UARCO, Inc.*, 122 F.3d 374, 387-88 (7th Cir. 1997) (finding employer not entitled to summary judgment on disparate-treatment claim because the early retirement policy "draws an express line between workers over fifty-five and those under").

We conclude that the KRS plan is facially discriminatory on the basis of age, and thus we hold that the EEOC has established a prima facie violation of the ADEA.

**B.    The EEOC Need Not Provide Additional Proof of Discriminatory Animus, As Discriminatory Intent Is Evidenced by the Facially Discriminatory Nature of the KRS Plan**

KRS argues that defendants are entitled to summary judgment because the EEOC has not provided any proof that KRS enacted the disability-retirement-benefits plan because of a discriminatory animus against older workers. Unfortunately for KRS, this argument runs contrary to Supreme Court authority and the history and purpose of the ADEA. Once a plaintiff has established that a policy is facially discriminatory in that it classifies or disadvantages an employee "because of" the employee's protected status, additional proof of discriminatory intent is not needed, as it is directly evidenced by the facially discriminatory nature of the policy itself. As the Supreme Court held in *Automobile Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991), a plaintiff

who has identified a facially discriminatory employment policy need not provide evidence of discriminatory animus to prevail on a disparate-treatment claim. *Johnson Controls* explained:

> [T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination.

The Supreme Court reaffirmed this approach in *Hazen Paper*, stating that evidence of intent to discriminate necessary for a disparate-treatment claim "can in some situations be inferred from the mere fact of differences in treatment." 507 U.S. at 609 (internal quotation marks omitted). *See also Jankovitz*, 421 F.3d at 653 (concluding that because retirement plan is facially discriminatory on the basis of age, "intent to discriminate can be presumed"); *Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 119 (3d Cir. 1983) (stating that "where an employer's policy or practice is discriminatory on its face, it is unnecessary for the plaintiff to make a separate showing of intent to discriminate.")

As it was bound by *Johnson Controls* and *Hazen Paper*, the *Lyon* panel at one point correctly recognized that intent to discriminate can be inferred from a defendant's knowledge of a disparate effect. *See Lyon*, 53 F.3d at 139 (stating that plaintiffs have not "alleged that [defendants were] aware of a disparate effect on older employees, such that we could infer intent from knowledge."). *Lyon* later uses language, however, that contradicts not only this earlier recognition but also the above Supreme Court precedent.[6] *See id.* ("Plaintiffs try to cure their lack of evidence of *intent* by inferring discriminatory animus on the basis of a disparate *effect* on older workers. This is circular, and would render meaningless the carefully-wrought distinction between disparate-impact and disparate-treatment theories of discrimination . . . ."). The original hearing panel in this case suggested persuasively that discriminatory "[i]ntent arguably should be inferred from the employer's knowledge concerning its own [retirement] plan," but continued that "[s]uch an argument is, however, foreclosed by *Lyon*." *EEOC v. Jefferson County*, 424 F.3d at 473. The panel continued in its criticism of *Lyon*, explaining why *Lyon*'s requirement that a plaintiff alleging disparate treatment must produce additional evidence of a defendant's discriminatory animus where the challenged employment action consists of a benefits plan is misguided because "the only action that will ever be taken in cases involving retirement plans — as opposed to individual adverse actions — is the action of writing the policy." *Id*. We agree, and we hold that an employer's intent to discriminate is directly evidenced by the employer's writing or adoption of a facially discriminatory employment policy.

Finally, KRS's argument that the only disparate treatment on the basis of age that the ADEA was designed to remedy is disparate treatment motivated by discriminatory animus against the old is nonsensical considering the origins of the ADEA. The Wirtz Report, which inspired Congress to enact the ADEA, found "no evidence of prejudice based on dislike or intolerance of the older

---

[6] The language in *Hazen Paper* upon which defendants, the district court, and the panel in *Lyon* appear to rely for their belief that additional proof of discriminatory motive is required is *Hazen Paper*'s statement that "a disparate treatment claim cannot succeed unless the employee's protected trait *actually played a role in* [the employer's decision-making process] and had a determinative influence on the outcome." *Hazen Paper*, 507 U.S. at 610 (emphasis added). A closer analysis of *Hazen Paper* belies defendants' argument. Immediately before making this statement, the Court in *Hazen Paper* gave examples of ways in which the protected trait could actually motivate an employer's decision and therefore constitute disparate treatment. With citations to its previous decisions in *Thurston* and *Manhart,* the Court gave as its first example "a formal, facially discriminatory policy requiring adverse treatment of employees with that [protected] trait." *Id*. It is therefore evident that the *Hazen Paper* language that defendants and *Lyon* cling to in an attempt to argue that *Hazen Paper* added an additional requirement of discriminatory animus was simply the Court's summary statement to describe the various circumstances that can constitute intentional action sufficient to support a viable disparate-treatment claim.

worker." Wirtz Report at 6. Despite the absence of discriminatory animus against older workers, Congress enacted the ADEA to fight arbitrary age discrimination, which Secretary Wirtz defined as age-based assumptions that lacked a basis in fact. *Id.* at 2. Thus for KRS's interpretation of the Act to be correct, it would mean that in passing the ADEA, Congress intended to prohibit only a type of age discrimination that it had been advised did not exist. We will not interpret the ADEA so narrowly and illogically.

There is simply no dispute that under the KRS plan, an employee's age actually plays a role in the defendants' decision-making process about what amount, if any, of disability-retirement benefits an employee receives, and that age therefore has a "determinative influence on the outcome" for the disabled older employee. *Hazen Paper*, 507 U.S. at 610. The KRS plan excludes hazardous-category employees age fifty-five and over from receiving disability-retirement benefits, and pays reduced benefits to older eligible disabled workers compared to their younger counterparts because of their age. The EEOC has established a prima facie ADEA claim.

## III. CONCLUSION

The EEOC has established a prima facie case of age discrimination because it has demonstrated that the KRS plan facially discriminates on the basis of age. No evidence of discriminatory animus is needed, as intent to discriminate on the basis of age is directly evidenced by the facially discriminatory nature of the KRS plan. We **REVERSE** the district court's grant of summary judgment to defendants and **REMAND** to the district court for further proceedings consistent with this opinion.

---

**CONCURRENCE**

---

ROGERS, J., concurring separately.  I concur in the result, generally for the reasons expressed in the majority opinion.  The following four concerns, however, prevent my concurring in that opinion.

First, the retirement plans at issue in this case discriminate in only one way rather than two. The majority's description of the first way in which the KRS plan discriminates is significant only as it constitutes a part of the second way.  That is, it is not facial discrimination to give older workers one kind of retirement plan and younger workers the same plan with a different name.  The only real difference between disability retirement and normal retirement is the one caused by the "second" discriminatory characteristic.  That is, if the retirement plans were called by the same name, there would be no age discrimination other than that arising from the attribution of unworked years (or more unworked years) based on age.  If that discrimination were cured, on the other hand, the "first" way in which the KRS plan discriminates would be semantic only.

Second, in my view it is unnecessary for the en banc court to characterize the panel opinion's treatment of our court's opinion in *Lyon*.  The panel opinion, available as it is in the Federal Reporter, speaks for itself, and in any event the panel opinion has been vacated.

Third, it is only necessary for us to overrule *Lyon* to the extent that *Lyon* is inconsistent with our en banc holding and reasoning.  I would leave to future litigants the task of going through *Lyon* and identifying what survives and what does not.

Finally, we should make clear that in this case we take no position on whether the result in *Lyon* can be supported by the early retirement exception to ADEA liability, 29 U.S.C. § 623(f)(2)(B)(ii).  The district court in *Lyon* granted summary judgment in favor of the defendants after finding that the plaintiffs had failed to establish a prima facie disparate-treatment claim and, alternatively, that the retirement plan at issue constituted a lawful early retirement incentive plan pursuant to § 623(f)(2)(B)(ii).  53 F.3d at 137.  Our court in *Lyon* did not reach the latter issue because it agreed with the district court regarding the plaintiffs' prima facie case.  *Id.*

---

**DISSENT**

---

BOGGS, Chief Judge, dissenting. The majority concludes that the disability-retirement plan of the Jefferson County Sheriff's Department, Kentucky Retirement Systems, and the Commonwealth of Kentucky (collectively referred to as "KRS") amounts to a facial violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq*., as amended by the Older Workers Benefits Protection Act ("OWBPA"), P. Law 101-433, 104 Stat. 978 (1990). I believe that a careful examination of the plan shows that it considers age only in combination with years of service and years to retirement age, and is a non-discriminatory way of providing workers with protection against disability before they have had an opportunity to earn a normal pension at retirement age. It therefore is not illegal under the Supreme Court's precedent in *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993), and I respectfully dissent.

Congress stated that the purpose of the ADEA is to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). 29 U.S.C. § 623(a)(1) prohibits an employer from, *inter alia*, "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."[1]

The Supreme Court has noted that the ADEA "broadly prohibits arbitrary discrimination in the workplace based on age." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 120 (1985) (internal quotation marks and citation omitted). In discussing the ADEA in *Hazen Paper*, the Supreme Court emphasized the distinction between the disparate treatment and disparate impact theories of employment discrimination. 507 U.S. at 609. The Court stated that under a disparate treatment theory, "[t]he employer simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics.] Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. . . . " *Ibid*. (second alteration and ellipsis in original) (internal quotation marks omitted) (quoting *Teamsters v. United States*, 431 U.S. 324, 335–36 n.15 (1977)).

The Court continued that "[i]n a disparate treatment case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Hazen Paper*, 507 U.S. at 610. The employer "may have relied upon a formal, facially discriminatory policy requiring adverse treatment of employees with that trait," *ibid*. (citing *Thurston*, *supra*, and *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 704-18 (1978)), or "may have been motivated by the protected trait on an ad hoc, informal basis." *Ibid*. "Whatever the employer's decisionmaking process," the Court noted, "a disparate treatment claim cannot succeed unless the employee's *protected trait actually played* a role in that process and *had a determinative influence on the outcome*." *Ibid*. (emphases added).

Defined in that way, the Court added, disparate treatment "captures the essence of what Congress sought to prohibit in the ADEA. It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." *Ibid*. "Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing

---

[1] "'[C]ompensation, terms, conditions, or privileges of employment' encompasses all employee benefits, including such benefits provided pursuant to a bona fide employee benefit plan." 29 U.S.C. § 630(*l*).

stereotypes." *Ibid*.    This type of stereotyping is nowhere found in the plan under consideration today.

In *Hazen Paper*, the Court addressed the question of whether an employer's firing an employee whose pension was shortly to vest violated the ADEA where the vesting of the pension was based exclusively on years of service.  The Court held that although pension status is typically correlated with age, and although it is perhaps true that "older employees of Hazen Paper are more likely to be 'close to vesting' than younger employees," age and years of service were nevertheless analytically distinct.  If the employer fired the employee because of pension status, not because of age, "[t]he prohibited stereotype ('Older employees are likely to be ___') would not have figured in this decision, and the attendant stigma would not ensue."  Such conduct would not violate the ADEA, the Court held.  507 U.S. at 611-12.  (The Court ultimately remanded for a determination of whether the firing had in fact been based on age rather than on years of service.  *Id*. at 613.)  In short, the Supreme Court held that, under the ADEA, companies could make a decision based solely on the need to save money, even if that decision bore more heavily, on average, on older workers, so long as the factor relied on was only correlated with age, not determined by age.  In our case, with much less base motives, the KRS plan is impacted by age only in relation to years of service and years remaining until normal retirement age, as shown by the examples given on pages 16 and 17, *infra*.

*Thurston*, an ADEA case cited by the Supreme Court in *Hazen Paper* as one in which the employer's formal, facially discriminatory policy showed intent to discriminate against older employees because of their age, fits comfortably within the "very essence" of the ADEA as discussed by the Court in *Hazen Paper*.  In *Thurston*, TWA had adopted a policy by which captains who were disqualified from serving in that capacity for reasons other than age were allowed to transfer to the position of flight engineer, and in the process to "bump" less senior flight engineers.  Pilots who were going to be disqualified from continuing to serve as captains because they had reached the age of 60, however, had to resort to bidding procedures in order to become a flight engineer, and if the procedures did not result in a flight engineer position, the captain had to retire at 60.  469 U.S. at 115-17, 120.  Under the TWA policy, the following results would obtain.  Captain A is disqualified from continuing to serve as captain because he is found to be incompetent.  Captain B is nearing age 60.  They are otherwise similarly situated.  Captain A is allowed to transfer to the position of flight engineer and bump less-senior flight engineers in the process, *id*. at 117; Captain B is not.  The Court found that the policy, under which "the method of transfer available to a disqualified captain depends upon his age," was "discriminatory on its face," and therefore amounted to direct evidence of age discrimination in violation of the ADEA.  *Id*. at 121-22.  The *Thurston* case is thus an example of a forbidden policy that, in fact, implicates a stigmatizing and inaccurate stereotype–that pilots over age 60 are less capable, or at least less valuable as employees, even than younger workers who have been relieved for incompetence.

TWA's policy clearly embodied the "essence" of what the ADEA sought to prohibit–that is, arbitrary age discrimination.  That is not the case with the KRS disability-retirement plan, nor was it the case with the early-retirement policy in *Lyon v. Ohio Education Ass'n and Prof'l Staff Union*, 53 F.3d 135 (6th Cir. 1995).  Here, and in *Lyon*, no such stereotype is implicated.

The majority contends that there are two ways in which the KRS plan facially discriminates against older employees.  First, workers with less than 20 years of service time (for employees in hazardous positions[2]) who become disabled before a certain age (in the case of employees in hazardous positions, 55) receive additional credit toward retirement, while those over normal

---

[2] I follow the convention of the parties, the original panel, and the majority of this en banc court, by referring to the KRS plan for employees in hazardous positions, although the analysis applies to the plan for employees in non-hazardous positions as well.

retirement age do not receive additional credits (that is, their years to normal retirement age is zero). Second, a disabled worker with fewer years remaining until retirement age may receive fewer additional credits than a worker with more years remaining.[3] But the calculations for determining disability benefits for workers who become disabled under age 55 and for normal retirement benefits for those over age 55 are the same, with the exception of the imputed years added to the former's service time.

> The original panel succinctly describes how the KRS plan works:

> When workers are disabled after they become eligible for normal retirement, they receive only normal retirement benefits. The amount of the yearly benefits is generally calculated as 2.5% of the employee's final compensation times the number of years worked. However, for employees who are not yet eligible for normal retirement (i.e., employees under age 55 and with fewer than 20 years of service), additional years are added to the number of years worked for purposes of the calculation. The number of years added is the number of years remaining until the worker *would have* reached either normal retirement age or twenty years of service, but no more than the number of years already worked.

*EEOC v. Jefferson County Sheriff's Dep't*, 424 F.3d 467, 469 (6th Cir. 2005) (footnote omitted), *vacated on grant of reh'g en banc*, 2006 U.S. App. LEXIS 258 (6th Cir. Jan. 4, 2006). The majority argues that because older employees with, e.g., 10 years of service and final pay of $50,000 receive fewer benefits than younger employees with the same years of service and final pay, the KRS plan is facially discriminatory. Yet the majority misses the point that a 53-year-old employee who becomes disabled is not similarly situated to a 33-year-old employee who becomes disabled, even if they have the same service years and final pay at the time of disability. All else being equal, the non-disabled 33-year-old of course has more years to work and live than does a non-disabled 55-year-old. *See Lyon*, 53 F.3d at 137, 140-41 (explaining that an early-retirement plan that "ensure[s] early retirees the same benefits that they would have received had they continued to work until their normal retirement date" did not pay older workers lower benefits *because of age*; two employees of different ages but equal years of service are not similarly situated). Here, the number of years of additional work credit lost is a factor related to, but not determined by, age.

In *Public Employees Retirement System v. Betts*, 492 U.S. 158 (1989), the Supreme Court confronted a disability-retirement plan that provided age-and-service retirement benefits to those who retired over a certain age (for Betts, the plaintiff, the retirement age was 60) and had a certain number of service years, or to those under the age who had served a set higher number of years. The plan also provided disability benefits to those under the retirement age who had served a certain number of years and suffered a disability. 492 U.S. at 162. The scheme in *Betts* provided that disability payments would constitute not less than 30% of the disability retiree's final average salary; no such floor existed for age-and-service retirees. Betts became disabled at age 61, and therefore was unable to receive disability benefits. She received in age-and-service benefits just over half what she would have received in disability. *Id.* at 163.

The Supreme Court stated that "[o]n its face, the . . . scheme renders covered employees ineligible for disability retirement once they have attained age 60." Yet the Court found that the scheme did not violate the ADEA because it fit under the then-existing provision of 29 U.S.C.

---

[3] "*May* receive" for two reasons: first, as shown below at pages 16 and 17, a younger worker may only need the same number of years for maximum benefits as an older worker (e.g., in the case of a 40-year-old with 15 years of service and a 50-year-old with 15 years of service), and second, additional credit is limited to the number of years already worked. Thus, a 49-year-old with six service years and a 40-year-old with six service years will each get the same benefit–six additional years of credit.

§ 623(f)(2) that exempted age-based decisions taken pursuant to the terms of "any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of" the ADEA. *Id*. at 161-62, 166. A year after the Supreme Court's decision in *Betts*, Congress passed the OWBPA, amending the ADEA. The OWBPA included a finding that "as a result of [*Betts*], legislative action is necessary to restore the original congressional intent in passing and amending the [ADEA], which was to prohibit discrimination against older workers in all employment benefits except when age-based reductions in employee benefit plans are justified by significant cost considerations." OWBPA, Pub. L. No. 101-433, § 101, 104 Stat. 978 (1990) (codified at 29 U.S.C. § 621 note).

In contradistinction to the plan at issue in *Betts*, the case the OWBPA was designed to overturn, the KRS plan does not provide younger workers with a specific benefit unavailable to older workers. In *Betts*, the crucial distinction was that a "disability" retirement gave a worker a guaranteed minimum income of 30% of the worker's final salary. Betts was disqualified from receiving that benefit solely on the basis of age, though she was qualified in every other respect. *Betts*, 492 U.S. at 162-63.

Under the KRS plan, a "disability" retirement is intrinsically no different from the "normal" retirement pension available to every worker. Benefits are based on years of credited service (augmented to a maximum of 20 for disabled workers ineligible for normal retirement), multiplied by a factor related to final salary. If "normal" benefits are greater than the augmented benefits for disability, of course, the greater benefits are provided. The plan simply provides that a worker who is disabled before reaching eligibility for normal retirement benefits has a way of receiving a retirement benefit equal to (or closer to) what he would have received had he not become disabled before reaching the normal retirement age or 20 years of service.

This is a very reasonable benefit, and one that a younger worker, in particular, would be more likely to value more highly than a newly-hired older worker, who would be more likely to have acquired other benefits from more extensive earlier employment. The extensive questioning by this court at oral argument, attempting to probe for a way to provide this sensible result under the appellants' reasoning, shows that we should not be too quick to assume that Congress intended, or commanded by the language it wrote, that such a reasonable plan was being outlawed.

It is worth repeating that the plaintiff here, Mr. Lickteig, is already eligible for "normal" retirement benefits, based on his 17 years of service and his having attained the normal retirement age (55 for employees in hazardous jobs). What he (or rather, what the EEOC on his behalf) is attempting to do in this suit is to prevent employees who have been granted a form of insurance against disability at a pre-retirement age from obtaining that benefit.

Several examples show how the KRS plan does not differentiate based on age, but on age only in relation to years of service.

1) Take two employees of the same age. One is 48 with 10 years of service, the other is 48 with 15 years of service. They both become disabled. The first employee gets 7 years of extra credit, which takes him to age 55, and the second gets 5 years of extra credit, which takes him to 20 years of service, but in each case it is as if the employee had worked until eligibile for normal retirement.

2) Take two employees with the same service. One is 50 with 15 years of service. The second is 35 with 15 years of service. They both become disabled. They each get exactly the same additional credit - 5 years - despite the difference in their ages, and with that additional credit, it is as if each had worked until eligible for normal retirement.

3) Take two employees with differing ages and years of service. The first is 45 with 10 years of service. The second is 40 with 17 years of service. They both become disabled. This time, the older worker actually gets a greater benefit because he will get credit for all of the 10 years that would bring him to the retirement age, whereas the younger worker will "max out" at the full 20 years of credit with only an additional 3 years of credit.

These examples demonstrate starkly that age is not a controlling variable in the operation of the KRS plan. They also show that the plan provides in practice exactly what was claimed for it by appellees' counsel in the argument before us: a way to insure against disability that is sensitive to the greatest loss caused by disability–the inability to continue earning credits toward retirement at a normal retirement age.

Many life insurance policies have a feature that if premiums are paid from the inception of the policy to age 65, no further premium payments are required. Some also have a feature called "disability waiver of premiums": if the policy holder becomes disabled, the insurance company will no longer collect premiums, in effect crediting the policyholder as though those premiums are being paid. Yet, on average, such a disability feature (which no one would contend constitutes age discrimination) works exactly like the KRS plan. The waiver feature is worth more to the person who is disabled at 40 than one who is disabled at 60, because, on average, the waiver is in effect for many more years. And one who is disabled after 65 receives no benefit at all, as the premium is already fully paid up.

It is undisputed, and patently obvious from the nature of the KRS plan, that both the rationale and the effect of that plan is to insure that all employees have a reasonable prospect of employer-sponsored insurance against a disability that occurs before retirement income becomes available. On average, if employee A is younger than employee B and both suffer the same disability at the same time, A 1) will have had less time to earn money and retirement credit, and 2) will have more years to live. The KRS plan is meant to, and does, ameliorate exactly the ways in which A and B are not similarly situated, by providing A with a "bonus" for the circumstances of the disability. That "bonus" depends on years of service and years to normal retirement age. The bonus will often, but not always, be larger for a younger worker than an older one. As the examples show, the bonus provided to employees who become disabled can vary from no additional credit to as much as 10 years' credit, in a fashion that may be correlated (just as pension status in *Hazen Paper* was correlated) with age, but far from perfectly.

The KRS plan has nothing whatever to do with "inaccurate and stigmatizing stereotypes" surrounding the relative ability of older employees to do the job–that is to say, Congress's reason for enacting the ADEA, as the discussion above and the majority's own analysis of the legislative history indicate (Maj. Op. pp. 6–7). There is no intimation in any part of the KRS plan of any demeaning or inappropriate stereotyping of older workers. All employees who are considered disabled under the KRS plan are equally unable to do their jobs–because of disability. The only factor resembling consideration of the nature of aging that counsel for appellants could adduce at oral argument was that some older employees might wish to work beyond normal retirement age (55 for hazardous employees, 65 for nonhazardous employees). But that does not differentiate between workers who are now more advanced in years and those younger. All such workers may wish to (and, had they not become disabled, might have been able to) work beyond that normal retirement age. But any retirement plan must have criteria for qualification, and using age as one of the criteria has never been thought to violate the ADEA. If KRS changed the plan to have a later retirement age, the mathematics of some of the computations would change, but the aspect being attacked here would remain. Thus, it is clear that impermissible stereotyping had nothing to do with the age-correlated features of the plan that are involved here.

Under the KRS plan, the employee's age *in relation to his years of service with the employer* factors into retirement benefits calculations. The majority, by dubiously labeling that plan as facially discriminatory under the ADEA, uses that statute to invalidate a policy that lies far from the "essence" of the ADEA–and, in fact, does not implicate that essence at all. Age in relation to years of service performed for this employer is not the same as age qua age. *See Hazen Paper*, 507 U.S. at 612 (the ADEA "requires the employer to ignore an employee's age (absent a statutory exemption or defense); it does not specify *further* characteristics that an employer must also ignore.").

There is a further problem with the majority's analysis. As the *Lyon* court noted, in reasoning that applies at least as much to this case:

> [The employer's] very willingness to ignore ageist stereotypes and hire workers of any age actually appears to have exacerbated plaintiff's "problem." Those most "disadvantaged" are those who were oldest at the time of hiring. It would be contrary to the letter, as well as the spirit, of the ADEA to penalize the employer for the incidental ramifications of objectivity.

53 F.3d at 140 n.6. Here, the older workers "discriminated against" are sometimes exactly those who were hired later in life, and thus had not accumulated as many years with this employer as a younger worker (although, as example 3 shows (*supra*, at 17), sometimes exactly this factor will give the later-hired older worker an advantage). Thus, I believe that neither the intent nor the letter of the ADEA bars the reasonable KRS retirement plan, and I respectfully dissent.